WATERMAN S. S. CORPORATION v. NA-
TIONAL LABOR RELATIONS BOARD
et al.

No. 8841.

Circuit Court of Appeals, Fifth Circuit.
May 16, 1941.
As Amended on Denial of Rehearing
June 2, 1941.

Gessner T. McCorvey and C. A. L. Johnstone, Jr., both of Mobile, Ala., for Waterman S. S. Corp.

Reeves R. Hilton, Atty., National Labor Relations Board of Washington, D. C., for National Labor Relations Board.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

Pursuant to the mandate of the Supreme Court, National Labor Relations Board v. Waterman S. S. Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704, this court on May 6, 1940, entered a decree enforcing an order of the National Labor Relations Board dated May 18, 1938, which, among other things, required the Company to "Take the following action, which the Board finds will effectuate the policies of the Act * * *; (b) Offer to the persons listed in appendices A and B and to C. J. O'Connor immediate and full reinstatement to their former positions, without prejudice to their seniority and other rights and privileges; (c) Make whole the persons listed in appendices A and B and C. J. O'Connor for any loss of pay they have suffered by the respondent's discriminatory acts, by payment to each of them of a sum of money equal to that which each would normally have earned as wages—includ-

ing therein the reasonable value of his maintenance on shipboard from the time that the ship he was employed on sailed again after his discharge or lay-off—during the period from the date of such discrimination against each of them to the date of the offer of reinstatement, less any amount each has earned during that period." The persons listed in Appendix A were seamen discharged in mass from the Steamship Bienville in July, 1937, because of union activities; and in Appendix B seamen similarly discharged from the Steamship Fairland; and O'Connor was at the same time and for like reason discharged as Assistant Engineer from the Steamship Azalea City.

The Board has petitioned for a contempt order, but concedes that the enforcement decree has been complied with in all respects except that some of the seamen and O'Connor have not been made whole in their losses. The Company has made a sworn answer which admits portions of the petition, denies other portions, and sets forth in detail the facts concerning the disputed matters. No evidence has been offered, and the case has been argued as if submitted on bill and answer. Punition is not sought so much as clarification as to the principles on which the wage losses should be computed.

■ We take as true the admitted portions of the petition. As to those denied we must take as true the allegations of the answer. Such is the rule in equity proceedings. On the facts thus appearing, five questions are argued for the Board, which we discuss in order.

■ 1. After offering reinstatement and before settling with the men the Company asked advice of the Board as to the calculations, but was told to make tenders directly to the men and advise the Board what was done. The Company made a full statement and calculation for each man and sent it to him with a release to sign which stated the calculation was understood and satisfactory, and that the sum sent was accepted in full satisfaction, and that reinstatement had been offered in accordance with the Board's order. Most of the men accepted the settlement and signed the releases. The Board thought the basis of settlement erroneous in particulars discussed below. The Company pleads the settlements as full compliance. The releases have evidentiary value to prove that an offer of reinstatement was made, and that the sum stated was paid, and that the item allowed for maintenance on ship was prima facie correct, and the like. As contracts of settlement they are without effect to bind the Board. The requirement in the Board's order to make whole the men who were illegally discharged was not made to vindicate the private rights of the men, but the policies of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. Agwilines, Inc. v. National Labor Relations Board, 5 Cir., 87 F.2d 146, 147. The Board alone may enforce its order. Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 265, 60 S.Ct. 561, 84 L.Ed. 738. A contract with the discharged employee to surrender his right to back-pay does not constitute compliance. National Labor Relations Board v. American P. & C. Corp., 9 Cir., 113 F.2d 232, 233, 129 A.L.R. 874. But since the Board is entitled to demand performance and is not bound by any settlement with the employee, we think it ought on request to co-operate with the employer in framing a proper tender, and we should be slow to punish as contemptuous unassisted tenders which are not in all respects correct but made in good faith. The Board in this case, though at first refusing to assist, did finally discuss all details with the Company, reaching an agreement on some, and developing pointed differences as to others.

■ 2. One such difference is whether the Company, having ascertained the time a discharged man worked elsewhere, should deduct that time from the time he would normally have worked, and should then be paid wages for the time difference; or whether his normal wages should first be fixed for the period he stood discharged, and his actual earnings elsewhere deducted. The latter is the plain requirement of the Board's order and of the enforcement decree. The Company shows that in many cases the rates of wages of the discharged men were higher elsewhere than before, so that the Company by its method of calculation overpaid them, and on an average paid out about the same as if actual earnings had been ascertained and deducted. This argues good faith in the method adopted, but is not strict compliance; for the order is that payment be made to each of what each would normally have earned, less what each has earned elsewhere. There must be correct individual settlements.

■ 3. The crews of the Bienville and Fairland were discharged in mass in July, 1937, for union activities. A number

of the men were individually re-employed in July, August, September, October and November following. The Board treats these as being in the same case with the men who were not voluntarily re-employed, and argues that their re-employment was not an offer of reinstatement without prejudice to their rights and privileges, because they were required to resign from the union of their choice and to join that with which the Company had a contract. The Company's answer, however, states as to these men: "All of said persons were reinstated at said times to their former positions, except that the rates of pay of four of them at the time of reinstatement was different, one being re-employed at a slightly higher rate, and three of them at a slightly lower rate, and each of them subsequently received employment with Waterman Steamship Company without discrimination." We understand that the changes in pay were due to an alteration in the pay of the positions, applicable to any who held such positions, and not to discriminations against the three men. The allegation is positive that otherwise they were all reinstated to their former positions without discrimination. This excludes an inference that they were required by the Company to change their union affiliation. They of course had the right to do so if they chose. On the facts appearing, these men were entitled by the terms of the decree to be made whole only for the time between their respective discharges and offers of reinstatement. An actual reinstatement includes an offer of reinstatement. We agree, however, with the Board that if reinstatement had been illegally or oppressively conditioned, it would not have been such an "offer of reinstatement" as would stop the consequences of the illegal discharge.

4. The Fairland ended her last voyage for the Company on Dec. 19, 1937, and was sold ten days later to an English company, and she was transferred to British registry. Two other vessels were sold at the same time. The members of the crew then serving on her were finally paid off and discharged, and none were given substitute employment, but any who were subsequently re-employed were hired through the union hall as strangers to fill vacancies. The Company sets up that on these facts the men of the Fairland's crew who had been illegally discharged in July previously would have lost their employment on Dec. 19, in the same way, so that after Dec. 19, 1937, "each would normally have earned as wages" nothing. The question presented is not without difficulty. When the case was first before this court, 5 Cir., 103 F.2d 157, we thought a seaman's employment was measured by his signed articles, which bound him to his ship and his ship to him. The Supreme Court held that behind the articles there was a custom of re-signing which generated a continuing status, like that of the usual indefinite employment in a factory or on a railroad, which was protected by the National Labor Relations Act. The evidence specially cited (309 U.S. page 213, 60 S.Ct. 493, 84 L.Ed. 704 and ff) related only to a customary re-employment on the same ship after a temporary lay-up of the ship. We do not know whether the custom extends to furnishing employment on another ship, or if it does, what period of idleness would normally intervene. In December, 1937, the Company sold three of its ships. It had bought two in October, 1937, but bought no others for nearly two years afterwards. There is no evidence of a seniority roll which would entitle a seaman to displace one on another ship, nor affirmative proof that the Company had no employment to offer. Remembering that the object of the back-pay order is to discourage discharges of employees contrary to the Act, we hold that an employee so discharged takes a peculiar status. By the words of the Act, Section 2(3), he is still an employee. The Board has a very broad discretion in vindicating the Act through him. Phelps Dodge Corp. v. N.L.R.B., 61 S.Ct. 845, 85 L.Ed. ——. The employer risks a back-pay order as a part of the consequences. He cannot escape it by selling the ship, or by any voluntary abolition of the particular job. The fact of the sale of the Fairland existed before the Board ordered reinstatement of the crew with back-pay, finding that action would effectuate the policies of the Act. The order is drastic, but we cannot say it was beyond the power of the Board. It was not inadvertent, for it is still insisted on. We do not mean to prejudge such extreme cases as the death of the employee, so that reinstatement could not be offered him, or a destruction of all the employer's ships or other places of employment, or his retirement from business. We hold simply that the voluntary sale of the Fairland did not end the potential liability to the back-pay order here made, nor limit the "normal wages" of the discharged men.

5. As to O'Connor, the Assistant Engineer on the Azalea City, the question is whether he "would normally have earned wages" for the whole time between his discharge and offer of reinstatement, or for seventy-five percent of it as is agreed was normal for seamen, or for 68.1 percent of it as the Company figures was the average of O'Connor's performance during his eight years in the service of the Company. He was in the habit of taking vacations at frequent intervals. It is fair to say that irregular service was normal with him. The Board and the Company have agreed that seventy-five percent is a fair average employment time for the other discharged men. We find that it will be fair for O'Connor also, under all the circumstances.

There were other differences, such as the proper sums to be allowed for maintenance and quarters on shipboard, but these have been settled. The parties desire to carry out the court's decree. To this end for a period of sixty days from the filing of this opinion no formal order will be entered. Either party at the expiration of that time may move for such order as the circumstances may warrant.