W. C. NABORS, d/b/a W. C. Nabors Company, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 19530.

United States Court of Appeals Fifth Cricuit.

Oct. 3, 1963.

George E. Duncan, Wells, Duncan & Beard, Beaumont, Tex., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Paul Elkind, Atty., N. L. R. B., Washington, D. C., Stuart Rothman, Gen. Counsel, Judith Bleich Kahn, Atty., N. L. R. B., for respondent.

Before RIVES, JONES and BROWN, Circuit Judges.

RIVES, Circuit Judge.

Pursuant to the opinion reported as N. L. R. B. v. Nabors, 5 Cir., 1952, 196 F.2d 272, this Court, on June 28, 1952, entered its decree upholding the Board's

determination that on April 8, 1948, the petitioner discriminatorily discharged, among others, the 11 employees involved in the present decision because they had engaged in union activity, and enforcing the order of the Board in 89 NLRB 538 which directed the petitioner to make whole the employees involved.

On February 11, 1955, the Board initiated civil contempt proceedings against the petitioner, alleging a failure to comply with the decree enforcing the Board's order. The parties thereafter entered into a stipulation which was filed with this Court, and the Court entered an order dated May 31, 1955, approving the stipulation and providing, *inter alia,* that "the questions relating to making whole the employees named in the Decree for losses sustained by them were subject to final determination by interlocutory hearings before the National Labor Relations Board and Proceedings before this Court * * *."

The back pay specification did not issue until March 25, 1959, nearly four years after this Court's order of May 31, 1955. On September 9, 1960, the Trial Examiner issued his supplemental intermediate Report, finding that 11 of the claimants were entitled to specific amounts of back pay. On December 7, 1961, the Board issued its Supplemental Decision and Order, and on March 29, 1962, its Correcting Order that the petitioner pay to the 11 employees involved in this proceeding as net back pay the following amounts:

| | |
|---|---:|
| Jeter C. Adams | $12,876.69 |
| Jessie L. Brown | 17,845.34 |
| Leroy P. Brown | 1,063.94 |
| Vernon D. Davis | 16,872.57 |
| Henry J. Hatcher | 544.86 |
| Alex C. Lafitte | 10,188.15 |
| Luther W. McNeese | 14,314.11 |
| William D. Roark | 728.99 |
| Lawrence L. Whitten | 2,374.82 |
| Thomas J. Williams | 10,628.38 |
| Willie T. Williams | 12,951.43 |

The petitioner insists that the back pay claims are prescribed by Articles 3534 [1] and 3536 [2] of the LSA–Civil Code, or else are barred by laches. The claimed prescriptive period is that between this Court's order of May 31, 1955 and the issuance of the back pay specification on March 25, 1959.

██ We may assume, arguendo, that that delay of nearly four years was such as to constitute laches or as to prescribe a private action for wages or damages in Louisiana. Compare also Article 3519 of the LSA–Civil Code.[3] It is well settled that the United States, or any agency thereof, is not bound by state statutes of limitation or subject to the defense of laches in enforcing a public right. United States v. Summerlin, 1940, 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283. The National Labor Relations Board "does not exist for the 'adjudication of private rights'; it 'acts in a public capacity to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining.' National Licorice Co. v. Labor Board [N.L.R.B.], 309 U.S. 350, 362 [60 S.Ct. 569, 84 L.Ed. 799]; and see Amalgamated Utility Workers v. [Consolidated] Edison Co., 309 U.S. 261 [60 S.Ct. 561, 84 L.Ed. 738]." Phelps Dodge Corp. v. N. L. R. B., 1941, 313 U.S. 177, 193, 61 S.Ct. 845, 852, 85 L.Ed. 1271. The fact that these pro-

---

1. In pertinent part:
 "Article 3534. The following actions are prescribed by one year:
 \* \* \* \* \*
 "That of workmen, laborers and servants, for the payment of their wages. \* \* \*"

2. In pertinent part:
 "The following actions are prescribed by one year:
 \* \* \* \* \*
 "That for injurious words, whether verbal or written, and that for damages caused by animals, or resulting from offenses or quasi offenses."

3. Construed in Wright v. Lumbermen's Mutual Casualty Co., 5 Cir., 1957, 242 F. 2d 1; Lumbermens Mutual Casualty Co. v. Wright, 5 Cir., 322 F.2d 759, 1963.

ceedings operate to confer an incidental benefit on private persons does not detract from this public purpose. See Jacksonville Paper Co. v. Tobin, 5 Cir., 1953, 206 F.2d 333, 334, 335; Creedon v. Randolph 5 Cir., 1948, 165 F.2d 918, 919, 920.

There is no indication that Congress intended to overrule this long-settled doctrine by the enactment of the Administrative Procedure Act. 5 U.S.C.A. § 1001 et seq. Indeed, sections 6(a) and 10(e) of that Act[4] gave Nabors a remedy to "compel agency action * * * unreasonably delayed."

■ We agree with the Board that the claims set forth in the back pay specifications are not barred by limitations or laches, and further that the evidence offered by the petitioner to show irreparable injury caused by the delay was irrelevant.

The petitioner urges very strongly that "profit shares" should not have been included in the computation of the gross back pay of the claimants. The relevant facts as to the profit shares are undisputed and are well narrated in the examiner's findings:

" * * * Respondent started distributing profit shares to his employees between 1916 and 1920 and with relatively few exceptions continued that practice until July 1959 when he sold his business. The profit share, as its name indicates, was derived from a percentage of the profits. On each occasion when a profit share payment was to be made, Respondent unilaterally determined what percentage of profits for the period covered he would allocate to the clock (production) employees and thereupon allocated that sum without discrimination among those employees on the basis of the regular hours of employment each employee had put in during that period. The sole requirement for eligibility to receive such profit shares was that the employee be on Respondent's payroll at the time payment was made. If an employee had been terminated for any reason whatever on the date payment was made, he was not eligible for such payment. An additional requirement that the employee be in 'good standing,' meant merely, according to Respondent, that the employee be on the payroll on the date of payment.

"Pursuant to the foregoing formula, Respondent throughout the back pay period made profit share payments to his incumbent employees semiannually in June and December of each year. The only exception was in June 1949, when no payment of profit shares was made and none was credited for that period in the Back Pay Specification.

"As indicated above, the profit share payment although paid with considerable regularity was a purely voluntary and gratuitous act on the part of Respondent and was wholly within his discretion. There was no contract, promise, or other commitment by Respondent either to pay a profit share at all or to pay it in any specific amount or manner. The percentage of profits allocated for that purpose varied from year to year, as Respondent saw fit. Respondent on numerous occasions told the employees that the profit share was not part of their pay. In Respondent's own words, the profit share was the product of 'an earnest effort to try to share the profits of the business with my employees as if they might have owned capital stock in the business without having them actually own it and participate in the management.' Moreover, Respondent did not take profit share payments into consideration in determining the regular hourly rate of each employee, and agents of the Wage and Hour Division of the Department of Labor who were apparently familiar with Respondent's practice in that regard made no remonstrance. Similarly,

4. 5 U.S.C.A. §§ 1005(a) and 1009(e).

the profit share payments were not taken into account in determining Respondent's premium rate for coverage under the Louisiana Workmen's Compensation Act under which premiums are determined on the basis of a percentage of the compensation paid to the employees.

"On the other hand, the amount of the profit share paid to each employee varied in direct ratio with the number of regular hours he worked during the relevant period and no other considerations entered into the determination of that amount. Taxes and social security payments were withheld from the profit shares just as they were from the regular pay of the employees. In fact, the employee received only one W-2 form at the end of the year which reflected both his regular and overtime pay and his profit share payments. Finally, Respondent often told his employees that they received the profit shares because they 'earned' them and that 'they would earn more money and I could pay more money by cooperating on that basis.' "

The examiner found that the back pay claimants are entitled to profit shares calculated on the same basis as the profit shares received by comparable employees who continued to work on equivalent jobs during the back pay period.

 It is, of course, settled that the authority of the Board to take affirmative action is remedial, not punitive. Republic Steel Corporation v. N. L. R. B., 1940, 311 U.S. 7, 11, 12, 61 S.Ct. 77, 85 L.Ed. 6. Its power as expressed in section 10 (c), 29 U.S.C.A. § 160(c), is "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter." In effectuating the policies of the Act, the Board has taken the position that the "make whole" concept does not turn on whether the pay was wholly obligatory or gratuitous, but on the restoration of the status quo ante. See Moss Planing Mill Co., 110 NLRB 933, 935, enforced as modified on other grounds, N. L.

R. B. v. Moss Planing Mill Co., 4 Cir., 1958, 256 F.2d 653, 654. In that case there was included in back pay an amount representing clothing given gratuitously as Christmas gifts. The Board's discretion to take such affirmative remedial action as will effectuate the purposes of the Act includes more than placing the employee in position to assert contractual or legally enforcible obligations. "Back pay" as used in section 10(c) includes the moneys, whether gratuitous or not, which it is reasonably found that the employee would actually have received in the absence of the unlawful discrimination. That principle seems to us so clear as to make unnecessary a discussion of the many persuasive authorities cited in the briefs of both parties. We cannot hold that the Board erred in including "profit shares" in the computation of the gross back pay of the claimants.

Petitioner insists that each of the claimants under consideration would have been terminated during the regular reduction of petitioner's work forces during the period January 1–May 25, 1949.

 The examiner and the Board agreed that two of the discriminatees would have been terminated by May 25, 1949, but not the other nine. Proof that the employer had no available jobs was an affirmative defense and the burden of establishing it rested upon the employer. N. L. R. B. v. Cambria Clay Products Co., 6 Cir., 1954, 215 F.2d 48, 56. We cannot say that the Board's findings are not supported by substantial evidence on the record considered as a whole. 29 U.S.C.A. § 160(c).

Petitioner takes the position that this Court held in N. L. R. B. v. Armstrong Tire & Rubber Co., 5 Cir., 1959, 263 F.2d 680, rehearing denied 265 F.2d 212, 5 Cir., that an employee who engages in self-employment and who at the same time does not make an adequate, good faith effort to obtain other employment, has thereby removed himself from the labor market, and terminated his right to claim back pay during his self-employed period. To the contrary, that decision recognized the principle invoked by the Board,

" * * * that *bona fide full self employment* will be regarded as complying with the obligation imposed upon a discharged employee to use reasonable diligence to keep himself in gainful employment and thus discharge his obligation of minimizing or mitigating his damages instead of failing to do so and looking to the employer to make good his self imposed losses." (263 F.2d at 683).

It merely held that the Board's conclusion arose "from a misapprehension or misjudgment of the proven facts and the unpermissible application to them of the principle invoked by the Board," that is, in short, that the employee's part-time work in his wife's icehouse was not *bona fide* self-employment.

██ Petitioner argues that Hatcher's back-pay award should be stricken in its entirety because Hatcher testified at the hearing that he desired to withdraw his claim, that he did not care anything about the case, and that he did not think the Company owed him a thing. Prior to the hearing Hatcher had cooperated with Board agents. The Examiner and the Board held that the withdrawal was ineffective. The authorities support their conclusion that the purpose of these back-pay awards is to deter unfair labor practices and not to enforce the private rights of the employees.

> "The Board is not, as respondents suggest, merely the statutory representative of the employees for recovery of their losses. Its primary function under § 10, in connection with which it makes specific monetary orders for specific employees, is to prevent conduct defined as unfair labor practices in § 8."

N. L. R. B. v. Deena Artware, Inc., 1960, 361 U.S. 398, 411–412, 80 S.Ct. 441, 4 L.Ed.2d 400 (concurring opinion). As this Court stated in Waterman S. S. Corp. v. N. L. R. B., 5 Cir., 1941, 119 F.2d 760, 761, 762:

> "The requirement in the Board's order to make whole the men who were illegally discharged was not

made to vindicate the private rights of the men, but the policies of the National Labor Relations Act * *."

See Nathanson v. N. L. R. B., 1952, 344 U.S. 25, 27, 73 S.Ct. 80, 97 L.Ed. 23. In N. L. R. B. v. E. A. Laboratories, Inc., 2 Cir., 1951, 188 F.2d 885, cert. denied 342 U.S. 871, 72 S.Ct. 110, 96 L.Ed. 655, (1951), it was held that the waiver of claims to back pay made by a union for its members, and not sanctioned by the Board, does not prevent the Board from ordering back pay. Thus the Board could properly elect to ignore Hatcher's withdrawal of his claim.

██ Petitioner contends that even if it is found that profit shares can be included in the computation of gross back pay, certain profit share payments should not have been included in the awards to McNeese, Hatcher, and Roark. It is pointed out by petitioner that on the dates some of the profit share payments were made these employees were found by the Examiner and Board to be willfully idle. Yet a portion of these payments were included, on a pro rata basis, in their back pay. The already quoted findings of the Examiner clearly state that the sole requirement for eligibility to receive profit shares was that the employee be on the payroll at the time the payment was made, and any employee terminated before that date was not eligible. Accordingly, we think that if any of the employees involved in this suit were retired from the labor market at the date of payment, the entire profit share should be excluded from his gross back pay. In the case of McNeese, the profit share declared December 31, 1950, should have been excluded entirely, rather than prorated on a quarterly basis. Contrary to petitioner's contention, however, the shares paid in June 1951 and June 1952 were excluded in their entirety by the Examiner. As to Hatcher, the share distributed June 1, 1948, should not have been allotted pro rata over a twelve-week period, nor should the share paid June 1950 have been apportioned on a quarterly basis; but the profit shares paid in December 1948 and De-

cember 1949 were properly excluded in toto. As to Roark, the profit share paid June 1, 1948, should have been totally excluded.

In addition to the foregoing contentions, the petitioner, in the course of a brief covering some 117 printed pages, insists separately as to each employee and on many items that the Board's findings are not supported by substantial evidence on the record considered as a whole. In accordance with Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456, we may not displace the Board's choice between two fairly conflicting views, even though we would justifiably have made a different choice had the matter been before us *de novo*. See N. L. R. B. v. Walton Mfg. Co., 5 Cir., 1963, 322 F.2d 187. The sole responsibility for determinations of credibility rests with the board, and we are bound by its conclusions. N. L. R. B. v. Ferguson, 5 Cir., 1958, 257 F.2d 88.

We have considered carefully each of petitioner's contentions as to the evidence supporting the awards for the various employees and shall here briefly discuss the main points so raised. As to Jeter C. Adams, petitioner asserts that he did not make a good faith attempt to obtain other employment, in that Adams looked only for work which would afford him the kind of living which he was making when he lost his job and that he failed to apply to all the possible employers in the area. It is also argued that Adams did not testify with any definiteness or clarity as to his interim expenses. The Board found that Adams had made a good faith effort to obtain employment—he was employed, either for himself or others, all but a small segment of the seven-year period; he testified to extensive efforts to obtain gainful employment; and he held jobs in different fields of endeavor. We believe that there is substantial, credible evidence in the record as a whole to support the Board's conclusion. The burden of proving a failure to make a reasonable search for other employment rests upon

the employer. N. L. R. B. v. J. G. Boswell Co., 9 Cir., 1943, 136 F.2d 585, 597. As to expenses, it should be recalled that in many instances over ten years had passed from the date they were incurred until the time of trial. Under these circumstances, we believe that the estimate of expenses formed a sufficiently adequate basis on which the Examiner and the Board could reach a reasoned conclusion.

Petitioner claims that Jesse L. Brown also made an insufficient search for work; that the proof did not establish a trip to Lufkin, Texas, for which expenses were allowed; that the distance of ten miles from Brown's home to petitioner's plant should have been deducted from the trip expenses; and that there was no proof of the mileages to the various cities. Again, there is substantial evidence that this employee made a good faith effort to obtain work. We will not challenge the Board's determination as to the credibility of Brown's testimony that he did make the trip to Lufkin. The Board could properly, judicially notice the distance between cities, see 9 Wigmore, Evidence § 2581 (3d ed., 1940); and the distance from Brown's home to the plant was not, in fact, included in the computation.

Petitioner asserts that during one period of unemployment Leroy P. Brown sought only construction work at great distances away. It is further contended that the expenses for these trips seeking employment should be excluded because of failure to investigate local opportunities. There was substantial evidence to support the Board's finding that Leroy P. Brown did make a good faith effort to obtain employment, and we agree with the Board that the trips for which expenses were allowed were reasonable. Petitioner should be aware that the trip to Hobbs, Texas, which he so strongly complains of, was expressly disallowed by the Examiner in his report, based on a finding that it was not made in search of employment.

Petitioner asserts that no back pay should be allowed Vernon D. Davis

from July 31, 1954 to August 5, 1954, while he was physically unable to work. The Board did, however, disallow this period. It is contended that from the time Davis quit a job for personal reasons no back pay should be allowed. Nevertheless, we agree with the Board that the back pay should resume when he obtained another job. There was some question as to the number of trips made to Longstreet, Louisiana, but it appears that some allowance was made for the days on which Davis did not drive.

■ The significant contentions as to Henry Hatcher have already been discussed. The only new contention made by petitioner as to Alex C. Lafitte is that there should not be included in his gross back pay a two-week period in which Lafitte did not work for his interim employer because of a strike. However, the record shows that Lafitte was not idle during this period—he looked for other work, and, in fact, did work elsewhere for three or four days, and was ready to come back to work whenever the personnel office informed him he could do so. Petitioner complains of a $40 expense item, but this was expressly excluded by the Examiner.

As to L. W. McNeese, petitioner asserts that he only looked for oil field work and that the nature of this work was such that he would be laid off for short periods. But there is credible evidence that he did look for other work during periods in which he was laid off.

There are no additional contentions as to William D. Roark. Petitioner suggests that Lawrence L. Whitten's testimony as to search for employment is unreliable because certain other parts of his testimony were impeached. As already stated, we will not attempt to pass on matters of credibility.

The evidence supports a conclusion that Thomas J. Williams did make exhaustive efforts to find various kinds of work. Petitioner objects to expenses of Willie T. Williams for four trips on which he rode with someone else, but the record shows that no claim was made for these trips. There is substantial evidence that at all times he had at least part-time employment and on those occasions was looking for a full-time job.

The relatively slight modifications which we have indicated in the Board's supplemental decision and order are, we think, susceptible of ready, indeed, mathematical computation by the Board, and for such purpose only the cause is remanded to the Board. The Board's supplemental decision and order, as corrected and modified, will be enforced.

Modified and enforced.