**REVISED MARCH 3, 2016**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-60796

United States Court of Appeals
Fifth Circuit

**FILED**

December 7, 2015

Lyle W. Cayce
Clerk

ENTERGY MISSISSIPPI, INCORPORATED,

Petitioner Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent Cross-Petitioner

Petition for Review and Cross Petition for Enforcement
of an Order of the National Labor Relations Board

Before BENAVIDES, CLEMENT, and HIGGINSON, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Petitioner Entergy Mississippi, Incorporated ("Entergy") is a power utility company. This case concerns the status of a certain group of Entergy's employees—dispatchers—under the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 151-169.

Dispatchers use various information systems to monitor the flow of electricity through Entergy's grid. The Supervisory Control and Data Acquisition ("SCADA") system "provides dispatchers with data concerning the load, voltage, and amps on breakers and circuits in the substations." *Entergy*

*Miss., Inc.*, Case No. 15-UC-149, slip op. at 4 (N.L.R.B. Feb. 7, 2007), http://apps.nlrb.gov/link/document.aspx/09031d458001c0bf     (*Entergy     I*). SCADA alerts dispatchers when a circuit experiences a sudden change in voltage or when a breaker trips. Upon hearing an alarm, dispatchers turn to the Automated Mapping and Facilities Management ("AM/FM"), which provides a visual map of the transmission and distribution lines in the system. *Id.* AM/FM monitors customers' calls regarding outages and predicts the device that has malfunctioned in the area of the outage. *Id.*

One of the dispatchers' most important duties is "switching." *Id.* at 5. "Switching is the sequential opening and closing of switches in the transmission and distribution system to isolate a section of power lines and to interrupt the flow of electricity so that field employees can perform routine maintenance or repair a section of line that has been damaged." *Id.* Dispatchers "draft switching orders, which are step-by-step procedures to open and close switches." *Id.* When an unexpected outage occurs, dispatchers contact field employees in the affected area and "dictate each step in the switching sequence." *Id.* "[T]he field employees write down each step as dictated by the dispatcher. The field employees then read each step of the switching sequence to the dispatchers to ensure its accuracy." *Id.* Dispatchers are also responsible for issuing clearance orders. *Id.* at 9. A clearance order signifies to field employees that electrical flow has been interrupted in a line or piece of equipment and it is safe to work on. *Id.*

Dispatchers also "call-out" field employees to work on trouble cases. *Id.* at 11. When SCADA alerts a dispatcher that an outage has occurred, the dispatcher can assign a field employee to go diagnose and correct the problem. During weather events or on weekends and holidays—when dispatchers often manage operations without much supervision—dispatchers can call field workers from the on-call list to dispatch to trouble areas. If multiple trouble

events occur at once, dispatchers have to identify the highest priority events, decide how many field workers to call-up from the on-call list, and allocate the available field workers to correct the problems.

In 2003, Entergy filed a petition with respondent National Labor Relations Board (the "Board"), arguing that dispatchers are supervisors under Section 2(11), 29 U.S.C. § 152(11). *Id.* at 2. The NLRA guarantees "employees" the right to unionize and appoint a bargaining representative. 29 U.S.C. § 157. It also requires employers to bargain with the workers' representatives. *Id.* § 158(a)(5). To ensure that unions stay loyal to workers' interests, Section 2(3), § 152(3), excludes "supervisors" from the class of "employees" guaranteed the right to unionize and bargain. In other words, by urging that dispatchers were "supervisors," Entergy sought to remove dispatchers from the local union.

The Board held a hearing in 2003, and an ALJ issued an opinion in 2004 denying Entergy's petition. *Entergy I*, at 2. Entergy filed a request for review with the Board, which was granted. *Id.* In 2006, with Entergy still waiting for the Board to hear its appeal, the Board decided *In re Oakwood Healthcare, Inc.*, 348 N.L.R.B. 686 (2006), in which it applied the supervisor definition to nurses based on their authority to assign employees using independent judgment. The Board remanded Entergy's petition for the ALJ to reconsider the case in light of *Oakwood*. The ALJ published *Entergy I* in 2007, holding once again that dispatchers are not supervisors under Section 2(11). *See id.* at 34. Entergy again filed a petition for review. The Board affirmed the ALJ's decision. *Entergy Miss., Inc.*, 357 N.L.R.B. No. 178 (Dec. 30, 2011) (*Entergy II*).

About the same time that Entergy first filed its petition to reclassify dispatchers as supervisors, it demanded that intervenor International Brotherhood of Electrical Workers, AFL-CIO, Local Unions 605 and 985 (the "Unions") remove all references to dispatchers from the collective-bargaining agreement. *Entergy Miss., Inc.*, 361 N.L.R.B. No. 89, at *4 (Oct. 31, 2014)

No. 14-60796

(*Entergy III*). In 2006, Entergy refused the Unions' request to bargain over the dispatchers' terms and conditions of employment. *Id.* at \*5. Pursuant to the Unions' complaints, the Board's Acting General Counsel filed a charge against Entergy, contending that it had violated Section 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1) and (5). *Entergy III*, at \*1. The Board's General Counsel moved for summary judgment based on the Board's decision in *Entergy II. Id.* In 2014, the Board granted summary judgment and held that Entergy had violated Section 8(a)(1) and (5). *Id.* at \*2-3, 5. This appeal followed.

## I.

We accord *Chevron* deference to the Board's reasonable interpretations of ambiguous provisions in the NLRA. *See NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 713 (2001) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984)). We will affirm the Board's legal conclusions "if they have a reasonable basis in the law and are not inconsistent with the Act." *Valmont Indus. v. NLRB*, 244 F.3d 454, 464 (5th Cir. 2001).

We will affirm the Board's factual conclusions if they are "reasonable and supported by substantial evidence on the record considered as a whole." *J. Vallery Elec., Inc. v. NLRB*, 337 F.3d 446, 450 (5th Cir. 2003) (quoting *Valmont*, 244 F.3d at 463). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012) (emphasis omitted) (quoting *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993)). "In determining whether the Board's factual findings are supported by the record, we do not make credibility determinations or reweigh the evidence." *NLRB v. Allied Aviation Fueling of Dall. LP*, 490 F.3d 374, 378 (5th Cir. 2007). And "[r]ecognizing the Board's expertise in labor law, [we] will defer to plausible inferences it draws from the evidence, even if we might reach a contrary result were we deciding the case

No. 14-60796

*de novo.*" *Valmont*, 244 F.3d at 463 (quoting *NLRB v. Thermon Heat Tracing Servs., Inc.*, 143 F.3d 181, 185 (5th Cir. 1998)).

"Whether an employee is a supervisor is a question of fact." *Entergy Gulf States, Inc. v. NLRB*, 253 F.3d 203, 208 (5th Cir. 2001). "Because of the 'infinite and subtle gradations of authority' within a company, courts normally extend particular deference to NLRB determinations that a position is supervisory." *Id.* (quoting *Monotech of Miss. v. NLRB*, 876 F.2d 514, 516 (5th Cir. 1989)).

## II.

### A.

Entergy argues that the Board's ruling lacks a reasonable basis in law because it is inconsistent with the Board's earlier decisions and with opinions from other circuits. The Board contends that its decision is reasonable because it relies on *Oakwood*. We agree with the Board and hold that its decision has a reasonable legal basis.

### 1.

Section 2(11), 29 U.S.C. § 152(11), which governs this appeal, defines "supervisor" as:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

The Supreme Court has interpreted Section 2(11) as setting forth a three-part test:

> Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their "exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment," and (3) their authority is held "in the interest of the employer."

5

No. 14-60796

*Kentucky River*, 532 U.S. at 713 (quoting *NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571, 573-74 (1994)).  The party asserting supervisory status has the burden of proof. *Id.* at 711-12. This case turns on the meaning of "assign," "responsibly to direct," and "independent judgment" in Section 2(11).

2.

"Assign," "responsibly to direct," and "independent judgment" as used in Section 2(11) are all ambiguous. *Mars Home for Youth v. NLRB*, 666 F.3d 850, 854 n.2, 855 n.3 (3d Cir. 2011) (holding that all three phrases are ambiguous); *see Health Care*, 511 U.S. at 579 (stating in dicta that the latter two phrases are ambiguous). Because *Oakwood* supplies reasonable interpretations of those terms, we owe deference to it.

Entergy contends that the Board has "waffled on the issue of whether utility-industry Dispatchers are supervisors," and thus, that this court owes little deference to the Board's recent interpretations of Section 2(11). But the Supreme Court recently clarified that federal courts must defer even to new, course-reversing agency positions when "the new policy is permissible under the statute, . . .  there are good reasons for it, and . . . the agency *believes* it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *accord Handley v. Chapman*, 587 F.3d 273, 282 (5th Cir. 2009).

Considering whether *Oakwood* satisfies the *Fox* test, we note first that Entergy essentially concedes that *Oakwood*'s interpretation of Section 2(11) is permissible under the statute. One need look no further than the thorough and well-reasoned opinion itself to discern that the Board's interpretation is reasonable. *See Oakwood*, 348 N.L.R.B. at 689-94. The Board explained that it adopted its new interpretations of Section 2(11) to further its mandate to protect workers, to faithfully follow the dictates of Congress and the courts, and to "provid[e] meaningful and predictable standards for the adjudication of

No. 14-60796

future cases and the benefit of the Board's constituents." *Id.* at 688. These are sufficient reasons to justify the Board's new approach. And there is no doubt that the Board intended *Oakwood* to mark a change in its application of Section 2(11). *See id.* ("[W]e herein adopt definitions for the terms 'assign,' 'responsibly to direct,' and 'independent judgment' as those terms are used in Section 2(11) of the Act.").

Because *Oakwood* satisfies both the *Chevron* and *Fox* standards, we defer to it when considering the Board's action.

3.

Entergy argues that the Board's ruling lacks a reasonable basis in law because—though the facts and law are the same as in *Gulf States*—the Board reached a contrary conclusion in this case. The Board contends that *Oakwood* changed the law by adding an adverse consequence requirement, and that this development explains the different outcome. The Board has the better argument.

In *Gulf States*, we considered whether electrical utility operations coordinators "responsibly direct[ed] others with independent judgment" and thus qualified as statutory supervisors. 253 F.3d 203, 209 (5th Cir. 2001). In defining "responsibly direct," we relied on *NLRB v. KDFW-TV, Inc., a Div. of Times Mirror Corp.*, 790 F.2d 1273, 1278-79 (5th Cir. 1986) and found that "[t]o direct other workers responsibly, a supervisor must be answerable for the discharge of a duty or obligation or accountable for the work product of the employees he directs." *Gulf States*, 253 F.3d at 209 (internal quotation marks and citation omitted).

This definition was later expanded by the Board in *Oakwood*, which held that to be "responsible" under Section 2(11), a putative supervisor "must be accountable for the performance of the task by the other, such that some adverse consequence may befall the one providing the oversight if the tasks

No. 14-60796

performed by the employee are not performed properly." 348 N.L.R.B. at 692.
Under this rule, the Board crafted a three-part test for determining whether a
putative supervisor "responsibly directs" an employee:

> [T]o establish accountability for purposes of responsible direction,
> it must be shown that the employer delegated to the putative
> supervisor the authority to direct the work and the authority to
> take corrective action, if necessary. It also must be shown that
> there is a prospect of adverse consequences for the putative
> supervisor if he/she does not take these steps.

*Id.*

Entergy argues that *Oakwood* simply adopted the *Gulf States* rule.
Although *Oakwood* adopted the general "accountability" standard set out in
*KDFW-TV*, it did not simply co-opt this court's existing law. *See Oakwood*, 348
N.L.R.B. at 691-92. Rather, it added to the "accountability" standard in at least
two ways. *See* 348 N.L.R.B. at 691-92. First, *Oakwood* made clear that the
putative supervisor must be potentially liable not only for his own failures, but
also for the failures of his subordinates. *See* 348 N.L.R.B. at 692; *see also, e.g.,
In re Croft Metals, Inc.*, 348 N.L.R.B. 717, 722 (2006) (interpreting *Oakwood*
and holding that movant showed accountability where the "record reveals that
the Employer has disciplined lead persons by issuing written warnings to them
because of the failure of their crews to meet production goals or because of
other shortcomings of their crews").  By adopting this requirement, the Board
hewed to the First Circuit's position in *Northeast Utilities Service Corp. v.
NLRB*, 35 F.3d 621, 625 (1st Cir. 1994), an opinion that *Gulf States* called into
doubt, *see* 253 F.3d at 210.

Second, *Oakwood* required those attempting to prove supervisor status
to "show[] that there is a prospect of adverse consequences for the putative
supervisor" because of the actions of subordinates. 348 N.L.R.B. at 692; *see
also, e.g., In re I.H.S. Acquisitions No. 114, Inc. d/b/a Lynwood Manor*, 350

8

No. 14-60796

N.L.R.B. 489, 490-91 (2007) (interpreting *Oakwood* to require specific evidence of actual or possible adverse consequences).

This change in controlling law explains the different outcomes in the two cases. In *Gulf States*, this court did not require the movant to prove that the putative supervisors were potentially liable for the subordinates' mistakes. But following *Oakwood*, the Board required Entergy to prove that dispatchers could be liable for the actions of field employees.[1] And there is substantial evidence to support the Board's decision. *See Entergy II*, at \*7. Because the Board's ruling has a reasonable legal basis, we affirm.

B.

The party alleging supervisory status bears the burden of proving that it exists by a preponderance of the evidence. *Oakwood*, 348 N.L.R.B. at 694. Entergy argues that there is not substantial evidence to support the Board's ruling that dispatchers are not supervisors. Specifically, Entergy contends that it proved that dispatchers "responsibly direct" field employees, "assign" them, and use "independent judgment" in performing both functions. There is substantial evidence to support the Board's determination that dispatchers do not "responsibly direct" field employees or "assign" them to a "time" or "significant overall duty." But the Board ignored evidence that arguably shows that dispatchers "assign" field employees to "locations" using "independent judgment." We affirm in part and vacate in part the Board's decision that dispatchers are not supervisors.

---

[1] Every circuit court that has interpreted *Oakwood* has read it to require responsibility for others' actions. *See NLRB v. NSTAR Elec. Co.*, 798 F.3d 1, 10 (1st Cir. 2015); *Avista Corp. v. NLRB*, 496 F. App'x 92, 93 (D.C. Cir. 2013) (per curiam); *Lakeland Health Care Assoc's, LLC v. NLRB*, 696 F.3d 1332, 1353 (11th Cir. 2012); *Rochelle Waste Disposal, LLC v. NLRB*, 673 F.3d 587, 596 (7th Cir. 2012); *Mars Home for Youth*, 666 F.3d at 854.

No. 14-60796

1.

We first address the Board's holding that dispatchers do not "responsibly direct" field employees. *See Entergy II*, at \*7-9. Again, *Oakwood* provides that a putative supervisor does not "responsibly direct" a subordinate unless the supervisor has the authority to direct the subordinate's work and take corrective action when necessary, and the supervisor could be held liable for the subordinate's performance of his job. 348 N.L.R.B. at 692.

Applying *Oakwood*, the Board held that Entergy failed to show that dispatchers "responsibly direct" field employees because the evidence showed "that the dispatchers are accountable for their own work, i.e., their own failures and errors, and not those of the field employees." *Entergy II*, at \*8. Entergy asserts that "the record contains numerous situations in which Dispatchers were disciplined solely because of errors made by field employees under their supervision." But the two examples it offers provide no support for the claim. Entergy points to testimony about a dispatcher named White. White correctly instructed a field employee to flip a specified switch, but the employee flipped the wrong one. White's supervisor testified that he did not plan to discipline White until he admitted that "[w]hen [he] was talking to [the field employee], [he] could feel that [the employee] was uncomfortable." The supervisor testified that he "coached and counseled" White—a form of discipline—because he knew the field employee was unprepared but proceeded anyway. The supervisor stated that "even though the switchman was the one who admitted that he made the error, [he] nonetheless held the dispatcher accountable."

The Board's acting regional director, who sat as the ALJ, refused to credit this testimony. As the ALJ noted, the manager "claims that he gave [White] a coaching and counseling session, but he acknowledges that he did not place a memo in the dispatcher's personnel file concerning the dispatcher being counseled for the performance of the field employee." Noting that

Entergy's disciplinary policy requires managers to document coaching and counseling sessions, the ALJ stated that he was "not convinced that the evidence establishes that the dispatcher actually received any degree of discipline." The ALJ's determination is entitled to deference. *See Carey Salt Co. v. NLRB*, 736 F.3d 405, 410 (5th Cir. 2013) (explaining that an ALJ's credibility determination, "adopted by the Board, merits special deference" (internal quotation mark and citation omitted)).

Entergy also points to testimony about an incident where a dispatcher's and field employee's joint error caused a major outage. But the testimony makes clear that the dispatcher was punished because he had a document containing necessary information, yet he failed to consult it. The testimony does not show that dispatchers are held liable for field employees' mistakes.

In sum, substantial evidence supports the Board's determination that dispatchers are accountable only for their own mistakes. And under *Oakwood*, this is sufficient to show that dispatchers do not "responsibly direct" field employees.

2.

We next address the Board's holding that dispatchers do not "assign" field employees, or do not exercise "independent judgment" when doing so. *See Entergy II*, at *9-12.

In *Oakwood*, the Board "construe[d] the term 'assign' to refer to the act of designating an employee to a place (such as a location, department, or wing), appointing an employee to a time (such as a shift or overtime period), or giving significant overall duties, i.e., tasks, to an employee." 348 N.L.R.B. at 689. The Board interpreted "independent judgment" to refer to an individual "act[ing], or effectively recommend[ing] action, free of the control of others and form[ing] an opinion or evaluation by discerning and comparing data." *Id.* at 692-93. The Board further explained that "a judgment is not independent if it is dictated or

controlled by detailed instructions, whether set forth in company policies or rules, the verbal instructions of a higher authority, or in the provisions of a collective bargaining agreement." *Id.* at 693. "On the other hand, the mere existence of company policies does not eliminate independent judgment from decision-making if the policies allow for discretionary choices." *Id.* The Board also reasoned that "[t]he authority to effect an assignment, for example, must be independent, it must involve a judgment, and the judgment must involve a degree of discretion that rises above the 'routine or clerical.'" *Id.*

The Board applied *Oakwood* when deciding *Entergy II. See id.* at *7. The Board assumed that dispatchers "assign" field employees to a place. *Id.* at *9-10. But it held that dispatchers do not exercise "independent judgment" because they "utilize a computer program that notifies them of trouble spot locations, and usually assign to trouble spots employees already assigned to that specific area." *Id.* at *10. In other words, the Board found that the dispatchers' job requires nothing more than reading a trouble report on a computer screen, looking at a list to determine the on-call worker for the relevant area, and telling the responsible worker to head to the location.

Although we give significant deference to the Board's factfindings, "[o]ur deference . . . has limits." *Carey Salt*, 736 F.3d at 410. "[A] decision by the Board that 'ignores a portion of the record' cannot survive review under the 'substantial evidence' standard." *Id.* (quoting *Lord & Taylor v. NLRB*, 703 F.2d 163, 169 (5th Cir. 1983)); *see Amoco Prod. Co. v. NLRB*, 613 F.2d 107, 111-12 (5th Cir. 1980) (holding that remand is appropriate when the Board fails to adequately explain the factual basis for its opinion).

The Board ignored significant portions of the record that show how dispatchers arguably exercise independent judgment when deciding how to allocate Entergy's field workers. Albert May, a union manager, testified that when there are simultaneous outages, dispatchers "decide which trouble to

handle first." After a dispatcher has sent a field employee to one location, he "ha[s] authority to redirect that person to another case of trouble." And "if there is more trouble than that one [field employee] can handle," the dispatcher "would decide to call out additional [field employees]." These decisions, in part, are guided by "standard operating procedure" and "if conflicts arise, then the dispatchers would consult an [operations coordinator] or a network manager to determine if [certain responses are] possible to do or not." Although the operating guidelines and union-generated on-call lists dictate which field employees will be on-call at any given time, those agreements "don't tell the dispatcher when or how many people to dispatch or when to hold [field employees] over [their regular shift]." The dispatcher seems to "decide how many troublemen or servicemen [are] necessary to handle . . . multiple cases of trouble."

Evidence in the record shows that dispatchers' judgment about how to allocate Entergy's field workers is guided by a range of discretionary factors. Dispatchers appear to prioritize outages affecting industrial customers that have special contracts with Entergy. Yet if an outage occurred at night or on a holiday when an industrial customer's factory was not operating, dispatchers might be expected to prioritize another customer instead. Dispatchers also apparently prioritize outages affecting customers with "special medical needs," along with prioritizing outages that affect large numbers of residential customers. If simultaneous outages of each type occur, there is no simple rule to guide the dispatcher's decision in who to help first. In sum, at times, a dispatcher may have to decide whether to send "[his] one crew" to a trouble location "with the most customers on it," to "the one that's got the hospital out," or to "the plastics plant that needs to be picked up."

Dispatchers apparently weigh other factors as well. There is evidence that they juggle logistical considerations, such as deciding whether a field

employee can complete a quick repair at a trouble spot that is along the way to an outage affecting a high-priority client. Dispatchers arguably must also consider whether a particular outage is likely to cause property damage to Entergy's facilities. And where, for example, an unrepaired outage from the previous day elevates the risk posed by a new outage, the dispatcher likely re-prioritizes given the facts on the ground.

Despite this complexity, "there are no standard operating procedures within Entergy for what is to be turned on — which kind of account's [sic] to be turned on first." "There is no handbook, guidelines or documents." *Id.* Dispatchers apparently learn how to prioritize clients "through the mentoring process."

Considering the interpretations announced in *Oakwood*, the evidence discussed above arguably shows that dispatchers "assign" field employees to places by exercising "independent judgment." Yet the Board ignored this evidence when explaining its reasoning. Decisions by the Board that ignore a relevant portion of the record cannot survive substantial evidence review. *See NSTAR Elec. Co.*, 798 F.3d at 13 n.10. Accordingly, we vacate the Board's decision that dispatchers do not exercise "independent judgment" when assigning employees to locations and remand for further proceedings on this narrow question.

3.

The Board held that dispatchers do not "assign" field workers to a time, that is, "to remain on the job at the end of their 8-hour shift to perform an overtime assignment." *Entergy II*, at \*12.

The Board reasonably discredited the testimony of three Entergy employees, who haltingly testified that dispatchers have the authority to require field workers to stay on-duty. *See Entergy II*, at \*10-11. The Board focused instead on the testimony of a dispatcher who stated that he "[did]n't

have the authority to force [a field employee] to stay." *Id.* at \*11. Inferring from this statement that managers never told dispatchers that they had the power to order field workers to work overtime, the Board held that no such power was likely ever delegated. *Id.* at \*11-12. The Board's legal reasoning is permissible and its factual determinations are supported by substantial evidence.

The Board held that dispatchers do not "assign" field workers to "significant overall duties." *Id.* at \*12. In *Oakwood*, the Board held that assigning an employee "to certain significant overall tasks (e.g., restocking shelves) would generally qualify as 'assign' within [its] construction." 348 N.L.R.B. at 689. On the other hand, "choosing the order in which the employee will perform discrete tasks within those assignments (e.g., restocking toasters before coffeemakers) would not be indicative of exercising the authority to 'assign.'" *Id.* Citing *Oakwood*, the Board reasoned that dispatchers do not assign field employees to a new, overall duty, but merely direct them to perform an ad hoc task before returning to their normal duties. *Entergy II*, at \*12. Here too, the Board's legal reasoning is permissible and its factual determinations are supported by substantial evidence. We affirm.

\* \* \*

The Board's legal reasoning is permissible and its rulings, in large part, are supported by substantial evidence. But the Board ignored significant evidence suggesting that dispatchers "assign" field employees to "places" using "independent judgment." Accordingly, we affirm in part, vacate in part, and remand for further proceedings on the narrow question of whether the dispatchers exercise independent judgment in assigning field employees to places.

## C.

Entergy argues that the doctrine of laches bars the Board from recouping money damages in this action. We disagree.

No. 14-60796

In *Nabors v. NLRB*, 323 F.2d 686 (5th Cir. 1963), this court held that the United States and its agencies are not subject to the defense of laches when enforcing a public right. *Id.* at 688. The court further held that when the Board brings an enforcement action under the Act, it acts in the public interest, even when it obtains money damages on behalf of private persons. *Id.* at 688-89. *Nabors* remains good law. *See, e.g.*, *Matter of Fein*, 22 F.3d 631, 634 (5th Cir. 1994) (holding that laches may not be asserted against the government when it acts in its sovereign capacity); *United States v. Arrow Transp. Co.*, 658 F.2d 392, 395 (5th Cir. 1981) ("The law remains unchanged: laches is unavailable as a defense against the United States in enforcing a public right."). We deny Entergy's laches defense.

### III.

For the reasons explained, we AFFIRM the Board's decision in all but one respect. We VACATE the Board's determination that dispatchers do not "assign" field employees to "places" through the exercise of "independent judgment" and we REMAND for further proceedings. The Board cross-appeals, asking this court to enforce its order. Because we hold the Board erred, we DENY the Board's request for enforcement.