REVISED - June 18, 2001

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 00-60334

ENTERGY GULF STATES, INC.

Petitioner-Cross-Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner,

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
LOCAL UNION NO. 2286

Respondent.

Petition for Review of an Order
of the National Labor Relations Board

May 31, 2001

Before REYNALDO G. GARZA, DAVIS, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

At issue is whether ten operations coordinators[1] ("OC") at an electrical utility are statutory supervisors within the meaning of the National Labor Relations Act, 29 U.S.C. § 151 et seq

---

[1] OCs are actually subdivided into lead OCs and regular OCs. The parties have stipulated that lead and regular OCs are not materially different for the purposes of this inquiry. Thus, we use the term "OC" to refer to both of these groups.

("NLRA" or "Act").  Petitioner Entergy Gulf States, Inc. ("Entergy" or the "Employer") asks this court to reverse a National Labor Relations Board ("NLRB" or "the Board") decision holding that OCs are not supervisors.  Because neither the facts nor applicable law has changed since the NLRB declared OCs to be supervisors in 1983, we will not defer to the Board's attempt to recharacterize them in 1999.  We grant Entergy's petition for review, set aside NLRB's bargaining order, and deny enforcement.

## FACTUAL AND PROCEDURAL HISTORY

Entergy is a Texas corporation that provides electricity to customers in Louisiana and Texas.  Respondent International Brotherhood of Electrical Workers, Local Union No. 2286 ("Union") represents a bargaining unit of the employer's workers.

This dispute centers on the responsibilities of Entergy's OCs.  Working from a central operations center, OCs monitor the status of power lines that distribute electricity to customers.  They receive reports of power outages from their computers or from a phone reception center and coordinate repairs with field workers.

During normal working hours, four to five OCs will be in the operations center monitoring separate service areas.  They report to a supervisor in the operations center.  Because of their grave responsibility to ensure continuous electrical service and their need to work without distraction, OCs have the authority to order even senior executives out of the operations center.

2

Crews of field workers are on duty during normal working hours conducting routine maintenance and service calls in their respective duty areas. Field workers normally speak with OCs during the day to execute "switching orders." A switching order is a set of instructions that disengages specific power lines without interrupting customer service and allows construction or maintenance crews to work safely on power equipment. Using information from computer systems, an OC writes a switching order to fit an individual situation. The OC typically faxes the order to a field worker. Once the worker arrives at the site, he calls the OC and reads back the switching order as he executes it. If the worker perceives a problem with the switching order, he can question it and suggest an alternative. OCs have ultimate responsibility over the process, however.

Aside from issuing switching orders, OCs also instruct field workers during the day as necessary to restore power or perform emergency switching. OCs may pull field workers off their daily work to address these situations when they arise.

OCs have more responsibility and interactions with field workers at night and on weekends. The OCs operate without a supervisor, although supervisors can still monitor activity in the operations center remotely via computer. Only two or three OCs remain in the operations center. The local field crews go home, leaving call rosters so the OCs know whom to contact in the event of an outage.

3

When customers or computer systems report power interruptions after-hours, an OC makes an initial determination whether to call up workers and how many to call. If there are many outages in one area, the OC can instruct an area supervisor to open the area office and handle the problems locally. Normally, however, the OC rouses on-call field workers individually to address the problems. These call-ups obligate Entergy to pay overtime.

The on-call field worker then goes to a trouble site and reports the nature of the problem to the OC. Where a switching order is necessary, the OC writes the order and the field worker implements it. When the field worker has completed all assigned repairs, he must report back to the OC before going off-duty.

When an area has multiple power interruptions, as in a weather emergency, the OC must prioritize repairs. Guidelines assist the OCs to set priorities during major power restorations, but OCs generally use their own discretion. The OCs may order a field worker to discontinue work on one problem and move to another.

OCs are ultimately responsible for managing after-hours power restorations. There is no "cookbook" response to these trouble calls. OCs are accountable for the time it takes to restore power, and receive counseling if they manage situations poorly. They are not responsible, however, if field workers fail

4

to follow instructions.  In those situations, OCs would notify the field worker's supervisor.

To some extent, OCs can reward or discipline employees.[2] OCs have the authority to issue low-level monetary awards to field employees through Entergy's "Shining Through" program, although there was no evidence that an OC had actually done so.  One witness did recall an OC recommendation to a supervisor that led to a higher-level award for a field worker.  With regard to disciplinary actions, OCs reportedly have "input" because they can speak to OC or field supervisors about the performance of a field worker.  One field worker testified, however, that he was unaware that OCs had any authority to reward or discipline him.

Technology and consolidation within Entergy have changed the OC position somewhat over the years.  OCs now do more of their work on advanced computers, which provide more information and allow OCs to monitor a larger service area.  As a result, the OC position has become more complex.

Entergy did not consider OCs to be supervisors before 1993.  In December 1993, however, Entergy merged with another entity and consolidated operations centers.  The reorganization removed a level of supervision above the OCs.  Shortly before the existing labor agreement expired in June 1995, Entergy petitioned

---

[2] The Employer stipulated that OCs could not reward or discipline field workers at all in a July 1995 NLRB hearing.  It then withdrew this stipulation during a hearing in August 1999, asserting that the facts had changed.  *Id.* at 237.

to remove OCs from the Union's bargaining unit.[3]  It argued that the NLRA did not cover OCs because they were statutory supervisors under the Act.

After a July 1995 hearing, an NLRB regional director found that the OCs were similar to workers that the NLRB considered supervisors in *Big Rivers Elec. Corp.,* 266 N.L.R.B. 380 (1983). The director concluded that OCs are supervisors and excluded them from the bargaining unit.  The Union appealed, and the NLRB ordered further proceedings.

The regional board held a second hearing in August 1999 and heard new testimony and evidence reflecting another reorganization at the Employer.  This evidence included a job description that the company released in 1998 stating that OCs "manage" and "supervise" personnel during outages.  It also included messages to personnel dated just a few days before the hearing purportedly "reaffirming" the supervisory power of OCs.

The new testimony also indicated that OC responsibilities have become more focused as the Employer drastically cut and centralized OC staff.  OCs stopped fielding customer calls at night and deciding whether to reconnect power for customers who claimed to have paid their bills.  Different employees now handle higher voltage transmission switching that used to be an OC responsibility.  Field employees now write their own switching

_____

[3]    At the time, the Employer was named Gulf States Utility Company and OCs were called Division Substation Operators.

6

orders when working on lesser power lines, significantly reducing the number of switching orders that OCs write.

Following the second hearing, an acting regional director reversed the original decision and found that OCs were not supervisors. She followed *Mississippi Power & Light Co.*, 328 N.L.R.B. 146 (1999), a decision that overruled *Big Rivers*.

The Employer appealed to the NLRB. The NLRB affirmed the finding that OCs are not supervisors and belong in the bargaining unit, and directed the Employer to negotiate with the Union accordingly. *Entergy Gulf States, Inc.*, 330 NLRB 196 (2000). The Employer appeals.

## STANDARD OF REVIEW

Whether an employee is a supervisor is a question of fact. *Monotech of Miss. v. NLRB*, 876 F.2d 514, 516 (5th Cir.1989). We must determine whether substantial evidence in the record supports the conclusion that OCs are not supervisors, and whether the Board's decision has a reasonable basis in the law. *Id*. Substantial evidence is evidence a reasonable mind might accept as adequate to support a conclusion. *Id*. Because of the "infinite and subtle gradations of authority" within a company, courts normally extend particular deference to NLRB determinations that a position is supervisory. *Id.*

When an agency's legal interpretation of a statute conflicts with its prior positions, however, the interpretation is

7

"'entitled to considerably less deference' by the courts than a consistently held agency view." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (refusing to defer where the INS's interpretations of a statute were inconsistent over the years); *see also NLRB v. United Food and Commercial Workers Union*, 484 U.S. 112, 124 n.20 (1987) (applying this principle in a labor case). Although the NLRB can change its policies and must respond to new circumstances, "a departure from past agency precedents requires at least a reasoned explanation of why this is done." *Fiber Glass Systems*, *Inc. v. NLRB*, 807 F.2d 461 (5th Cir.1987) (remanding because the NLRB failed to apply an inference that it used in similar cases).

## DISCUSSION

The crux of this case is that the NLRB departed without a "reasonable explanation" from the position it had espoused for nearly twenty years, and the position circuit courts enforced for many years before that, that electrical industry employees just like OCs are indeed supervisors. *Mississippi Power & Light* is unreasonably inconsistent with previous precedents under the NLRA.

Section 152(11) of the NLRA defines "supervisor" as

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

8

Under the statute, therefore, an employee is a supervisor if 1) he has the authority to engage in one of the twelve listed activities; 2) the exercise of that authority requires independent judgment; and 3) he holds the authority in the interest of the employer. *NLRB v. Health Care & Retirement Corp. of America*, 511 U.S. 571, 574 (1994).

Several general considerations guide the inquiry. Supervisory status is not construed broadly because those deemed supervisors lose rights which the Act seeks to protect. *GAF Corp. v. NLRB*, 524 F.2d 492, 495 (5th Cir.1975) (holding that a temporary foreman was not a supervisor). This court looks beyond job titles and specified hierarchical stations to an employee's actual authority and responsibility. *NLRB v. Dickerson-Chapman, Inc.*, 964 F.2d 493, 497 (5th Cir.1992) (holding that certain telephone company crew foremen were not supervisors). Finally, secondary indicia of supervisory authority may be pertinent, including the perceptions of other workers, attendance at management meetings, time spent ordering others around rather than engaging in production work, salary, distinctive clothing, and the ratio of employees to supervisors. *Monotech of Miss. v. NLRB*, 876 F.2d 514, 517 (5th Cir.1989) (applying secondary indicia to find that lead hands at a production and maintenance facility were supervisors).

Here, the only issues in dispute are whether OCs use independent judgment to responsibly direct, reward, or discipline

others. Because we focus on whether OCs responsibly direct others with independent judgment, it will be unnecessary to consider the extent to which OCs reward or discipline others.

To direct other workers responsibly, a supervisor must be "answerable for the discharge of a duty or obligation" or accountable for the work product of the employees he directs. *NLRB v. KDFW-TV, Inc.*, 790 F.2d 1273, 1278 (5th Cir.1986) (finding substantial evidence that producers, directors, and assignment editors of a television newscast program did not responsibly direct other employees). Routine technical commands executed by technical personnel do not indicate supervisory authority. *Id.*

Before 1983, the NLRB consistently held that electrical utility workers closely resembling OCs did not responsibly direct others and were not statutory supervisors. Courts of appeals refused to enforce these decisions, concluding that the workers were statutory supervisors. *See Southern Ind. Gas and Elec. Co. v. NLRB*, 657 F.2d 878, 886 (7th Cir.1981) (involving systems supervisors that monitored power generation and distribution and wrote switching orders); *NLRB v. Detroit Edison* Co., 537 F.2d 239, 243 (6th Cir.1976) (involving systems supervisors who monitored power distribution); *Arizona Public Serv. Co. v. NLRB*, 453 F.2d 228, 232 (9th Cir.1971) (involving system load supervisors who prioritized and directed field workers during after-hours power restorations); *West Penn Power Co. v. NLRB*, 337 F.2d 993, 1000 (3rd

10

Cir.1964) (involving power transmission and distribution supervisors that prioritized repairs and de-energized lines for repair). The courts rejected the NLRB's arguments that the workers only "requested" cooperation from field workers who were employed under separate chains of command. Courts were not dissuaded by evidence that the OC-like workers referred to written protocols, consulted with superiors in emergencies, and did not outwardly appear to be supervisors.

Eventually, the NLRB bowed to the body of caselaw and held that these workers were statutory supervisors. In *Big Rivers Electric Corp.*, overruling its previous decisions, the Board held that systems supervisors who wrote switching orders and coordinated power restoration after-hours responsibly directed other employees. 266 NLRB 380, 382, 383 n.2 (1983).

All was well until 1994, when the First Circuit held that pool coordinators who bought and sold electricity and implemented maintenance schedules at plants were not supervisors. *Northeast Util. Serv. Corp. v. NLRB*, 35 F.3d 621, 625 (1st Cir.1994). The court concluded that "quasi-professional, quasi-overseer" pool coordinators were not accountable for the actions of others and were not statutory supervisors. It suggested that the Board reexamine its views in the public utilities setting. *Id.* at 626.

Citing this "invitation," the NLRB reverted to its original position. *Mississippi Power & Light Co.*, 1999 WL 551405

(1999). The Board overruled *Big Rivers* on the ground that its decision in that case overemphasized the complexity of the work and the grave safety responsibility vested in the workers. *Id.* at *8. It distinguished traditional supervisors from skilled employees who merely use professional judgment to direct others. *Id.* at *9 (citing medical "charge nurses" as an example of non-supervisors). The Board asserted that changes in the modern workplace require a recognition that quasi-professional, quasi-overseer employees are not supervisors under the Act. *Id.*

*Mississippi Power & Light* then applied these principles to system and distribution dispatchers whose responsibilities closely resemble those of the Entergy OCs. The Board noted that preexisting rules governed the dispatchers' actions, and that they collaborated with field workers to determine when additional field workers were necessary. *Id.* at *11-12. It also found that any judgment the dispatchers used was based on common sense or technical expertise rather than supervisory control over personnel. *Id.* at *12-13. As a result, it concluded that dispatchers were not statutory supervisors.

We conclude that the Board's latest reversal in *Mississippi Power & Light* is unwarranted. The pre-1983 court decisions involved workers virtually indistinguishable from OCs. The Board finally harmonized its approach with this series of decisions in *Big Rivers*, only to reassert its original conclusion

12

following *a single outcome in Northeast Utilities*.  Given such vacillation, the Board's classification of this group of workers in *Mississippi Power & Light* is entitled to little judicial deference.

*Northeast Utilities* does not justify the Board's latest change.  The material responsibilities of the pool coordinators in that case were distinct from those of the OCs.  The pool coordinators were engaged in buying and selling power with other utilities.  They also set and implemented maintenance schedules for transmission elements, *Northeast Utilities*, 35 F.3d at 623, but otherwise apparently had no role in identifying and repairing power distribution problems.  There is no indication that they directed field crews at all.  Given these differences, *Northeast Utilities* neither contradicts the earlier circuit decisions nor supports a reevaluation of the status of OCs.[4]

Further, the Board's observation that modern "work force and workplace changes" make quasi-professionals and quasi-overseers more common cannot justify its policy change.  In *Mississippi Power & Light*, 1999 WL 551405 at *10, the Board conceded that the facts of *Big Rivers* were indistinguishable.  *Id.* at 8.  The Board thus relied on general labor trends to justify a status change while admitting that the particular job at issue had not materially

---

[4]    The *Northeast Utilities* decision also distinguishes the degree of responsible direction of other employees exercised by electric power coordinators from the more significant authority of OC-like employees in a previous case. *Northeast Utilities* 35 F.3d at 625, citing *Maine Yankee Atomic Power Co. v. NLRB*, 624 F.2d 347 (1st Cir. 1980).

13

changed.  It is the specific facts, not the Board's perception of labor trends, that must determine how the relevant law applies.

Nor is there substantial evidence that OC supervisory responsibilities have significantly diminished in recent years. Technology and organizational developments have both added to and reduced OC responsibilities, but the material OC tasks have not changed.  OCs still operate without supervision and direct field workers after-hours.  They independently decide whether to open up an area office or how many workers initially to call to duty.  They have discretion to prioritize repairs in a particular area and move field workers between jobs.  Call shifts for field workers do not end until OCs release them.  OCs have considerable responsibility for safe switching orders and timely power restorations.  The OC's "effectively direct field operations during emergencies and after hours."  *Arizona Pub. Serv. Co.*, 453 F.2d at 232.  It is simply incorrect to describe the OCs' directions to field personnel as an "almost routine or clerical dispatching function."  1999 WL 551405 at *14.[5]  Like the other courts of appeals, we conclude that

---

[5]     In *Exxon Pipeline Co. v. NLRB*, 596 F.2d 704, 706 (5th Cir.1979), this court affirmed the Board's decision that oil pipeline movements supervisors did not responsibly direct others and were not statutory supervisors.  The supervisors monitored the flow of oil using computers in a central office and were in close contact with field personnel to start and shut down pipelines and pumps.  Oil movements supervisors did little more, however, than notify field workers of problems, and field workers then participated equally to decide whether and when to effect a repair.  Exxon Pipeline properly distinguishes the oil supervisors' duties from those at issue in OC-type cases, and we find no controlling analogy between that case and this one.

because OCs responsibly direct field workers using independent judgment, they are statutory supervisors.

The Board also attempted in *Mississippi Power & Light* to analogize OCs' duties to those of charge nurses, who, the Board has held, use their technical expertise and judgment to make complex decisions but do not necessarily exercise supervisory judgment in assigning and directing others. This argument is no longer viable. NLRB v. Kentucky River Community Care, Inc., 523 U.S. ___, 2001 U.S. App. LEXIS 4119, * 25-29 (2001) (rejecting the Board's argument that registered nurses at a mental care facility were not supervisors because they only exercised technical judgment).

In summary, we hold that the Board had no reasoned basis to reverse its *Big Rivers* position on these workers in *Mississippi Power & Light*, and the latter decision is inconsistent with still-governing circuit court law interpreting the NLRA. Substantial evidence does not support the Board's decision to turn its back on factually indistinguishable caselaw. We conclude that OCs responsibly direct field workers with independent judgment and are therefore statutory supervisors who should not be in the bargaining unit. We REVERSE the Board's bargaining order directing the Employer to negotiate with a bargaining unit that includes the OCs, and deny its enforcement.

**ORDER REVERSED, ENFORCEMENT DENIED.**

15