# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 2, 2020

Lyle W. Cayce
Clerk

No. 19-60616

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, CLC, LOCAL UNIONS 605 AND 985,

      Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,

      Respondent

On Petition for Review of Decision and Order
of the National Labor Relations Board

Before JONES, ELROD, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge.

Under the National Labor Relations Act ("NLRA" or "Act"), it is an "unfair labor practice" for an employer "to refuse to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(5). This case requires the court to determine whether transmission and distribution dispatchers, a group of workers employed by Entergy Mississippi, Incorporated ("Entergy"), are "employees" or "supervisors" under the Act. The unions representing Entergy's dispatchers (collectively, "IBEW") argue that the National Labor Relations Board ("the Board") erred when it deemed dispatchers "supervisors," thereby excluding them from the Act's collective bargaining protections.

No. 19-60616

This is the third time that we have been asked to consider the employment status of Entergy's dispatchers. Because we hold that the Board's most recent decision was well-reasoned and supported by substantial evidence, we AFFIRM.

I.

Entergy is a power utility company "engaged in the production and distribution of electrical power." The company distributes electrical power to residential and commercial customers across fourteen geographic networks in the state of Mississippi. In the event of an unexpected interruption in service, Entergy's transmission and distribution dispatchers work with field employees to restore power to the affected areas. The term "field employees" encompasses a broad array of workers employed by Entergy, including "mechanics, troublemen, linemen, relaymen, switchmen, and substation employees." Each year, dispatchers are responsible for addressing between 20,000 and 25,000 unexpected outages, or cases of "trouble."

When a dispatcher learns of a trouble area, he may interrupt a field employee's daily schedule and ask the employee to report to the area to diagnose and correct the problem. Once summoned by a dispatcher, a field employee remains under the direction of the dispatcher until he is released.[1] Even after an outage has been resolved, a dispatcher may "continue[] to route [field employees] around [to other trouble areas]." Dispatchers retain the ability to direct field employees to new trouble areas as the circumstances of an outage evolve. Although a dispatcher cannot force a field employee to stay

---

[1] As the Board explains in its brief, there may be an exception if a field employee has to deal with a "major critical emergency at home." Most often, however, field employees are "required to stay at work and continue to work until released" by the dispatcher.

## No. 19-60616

on the job after hours,[2] he can ask an employee to leave his designated geographic area in order to address an outage in a different location. In fact, it is "standard operating procedure" for a dispatcher to ask a field employee to travel to a new trouble area and remain there in the event that additional service issues develop.

In some cases, multiple field employees are required to address a given outage. Typically, the first field employee to arrive on the scene of an outage informs the dispatcher how many additional field employees are needed to effectively resolve the issue. The parties' collective bargaining agreement requires dispatchers to provide field employees with all of the resources—including people—necessary to complete a job. However, it is ultimately up to the "system dispatcher to make [the] call" regarding how many field employees to designate to a particular trouble area. Entergy does not maintain clear guidelines dictating how many employees a dispatcher should summon for each emergency situation. Instead, "[t]he dispatcher [is] . . . held accountable . . . for calling more help if he needs it," juggling the requests of field employees and the evolving conditions on the ground.

Dispatchers are sometimes forced to decline field employees' requests for additional support in order to protect the safety of other employees or to prioritize more pressing matters. For example, if the dispatcher determines that there is a higher-priority outage that must be addressed first, he might delay sending additional resources requested by field employees. In making this determination, dispatchers consider numerous factors, including the severity and urgency of the outage, the weather, and the nature of the clients affected by the outage. These factors are not exclusive or firm, and dispatchers

---

[2] The Board also heard testimony explaining that *no* employee of Entergy—including the CEO—would have the authority to force a field employee to stay after-hours.

are often required to make quick decisions based on unique circumstances. It is the dispatcher's responsibility to "prioritize[] the work for [field employees] and send[] them and direct[] them to where [the dispatcher] needs them." If the dispatcher decides to wait to send additional help, he can redirect field employees to other trouble areas until he is able or willing to direct the necessary resources to resolve the larger outage.

Sometimes, a dispatcher must handle multiple trouble areas simultaneously. In those cases, dispatchers are responsible for determining the order in which to address each outage. Dispatchers rely upon a loose set of criteria in making prioritization decisions, but Entergy does not maintain strict rules that mandate dispatchers address certain outages before others.[3] Therefore, while it might be "good practice" for a dispatcher to resolve an outage at a hospital before directing field employees to other areas of trouble, it is "not a rule." It is ultimately up to the dispatcher to "weigh all th[e] variable factors" to make a prioritization decision. Dispatchers may seek to prioritize outages that affect larger clients, referred to as "major accounts," but they retain the discretion to adjust their priority list based on "the situation at hand." If an outage occurs after hours or at a time when a "major account" is not operating, dispatchers may prioritize a different outage in order to best serve the needs of all customers. Dispatchers are also expected to balance logistical considerations, and may ask a field employee to address a smaller outage on the way to a larger or more critical outage. In making these decisions, dispatchers consider a host of factors, such as whether an outage is expected to damage a customer's facilities or whether unrepaired outages could increase the risk that a new outage develops.

---

[3] Dispatchers receive informal training from more senior dispatchers regarding the process of prioritizing multiple outages.

4

No. 19-60616

In the event that multiple outages simultaneously affect several major accounts, dispatchers use their discretion to determine which account to address first. They must make quick decisions regarding whether to send field employees to the trouble area "with the most customers" or the one where a hospital is located—a discretionary choice not susceptible to clear guidelines or rules. In short, there is "no handbook, guidelines or documents" for determining how to prioritize multiple trouble cases that each affect a major account.

## II.

In 2003, Entergy filed a petition with the Board to have dispatchers recognized as supervisors under Section 2(11) of the NLRA, as amended, 29 U.S.C. § 152(11). *See* 29 C.F.R. § 102.60(b) (authorizing a labor organization or an employer to file a petition for "clarification of an existing bargaining unit"). After a hearing, the Board's Acting Regional Director concluded that dispatchers are not supervisors because they act in accordance with "established rules and within limited parameters."

Entergy sought review of the Acting Regional Director's decision, and the Board granted the request. The Board remanded the case for further consideration in light of the Board's then-recent decision in *Oakwood Healthcare, Inc.*, 348 NLRB 686 (2006). On remand, the Acting Regional Director issued another order reaffirming the conclusion that dispatchers are employees, not supervisors. Entergy again sought review from the full Board, and the Board affirmed the Acting Regional Director's decision.

Despite the Board's conclusion, Entergy refused to bargain with dispatchers, and the Board's Acting General Counsel filed a charge against the company, asserting that its actions violated Sections 8(a)(1) and (5) of the NLRA. *See* 29 U.S.C. §§ 158(a)(1), (5) (deeming it an unfair labor practice to

"interfere with, restrain, or coerce employees in the exercise of [their] rights," and to "refuse to bargain collectively with [an employee's] representatives"). The Board concluded that Entergy had unlawfully failed to recognize dispatchers as part of the bargaining unit, and granted the Acting General Counsel's motion for summary judgment.

Entergy petitioned the Fifth Circuit for review of the Board's decision. On August 1, 2014, the court applied the Supreme Court's recently-issued decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), and held that the Board lacked a quorum when it issued its summary judgment order. *See Entergy, Miss., Inc. v. NLRB*, 576 F. App'x 415 (5th Cir. 2014) (per curiam) [*Entergy I*]. As a result, it vacated the order and remanded the case back to the Board. *Id.* On October 31, 2014, the Board again concluded that Entergy had engaged in unfair labor practices by refusing to bargain with dispatchers, and Entergy sought review from this court. *See Entergy Miss., Inc. v. NLRB.*, 810 F.3d 287, 292 (5th Cir. 2015) [*Entergy II*].

On December 7, 2015, we issued our decision in *Entergy II*. The unanimous panel concluded that there was substantial evidence in the record to support the Board's decision that dispatchers do not "responsibly direct" field employees or "assign" them to a "time" or to a "significant overall dut[y]." *Id.* at 296, 298. However, we remanded to the Board on one "narrow question"—"whether the dispatchers exercise 'independent judgment' in assigning field employees to places." *Id.* at 298. We explained that the Board had ignored evidence that "arguably shows" that its original decision on this question was flawed. *Id.*

On remand, the Board reconsidered its previous decisions and held that the evidence identified by our court "establishes that the dispatchers assign field employees to places using independent judgment." As a result, the Board concluded that dispatchers fit within one of the statutory definitions of

No. 19-60616

"supervisor" and were therefore excluded from the collective bargaining unit. IBEW timely appealed.

III.

Whether an employee meets the statutory definition of "supervisor" is a question of fact. *Entergy Gulf States v. NLRB*, 253 F.3d 203, 208 (5th Cir. 2001). As the party seeking to establish the supervisory status of dispatchers, Entergy bears the burden of proving that dispatchers meet the NLRA's definition. *Entergy II*, 810 F.3d at 295.

Under 29 U.S.C. § 160(e), the Board's findings of fact are "conclusive" if they are "supported by substantial evidence on the record considered as a whole." "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *Creative Vision Res. v. NLRB*, 882 F.3d 510, 515 (5th Cir. 2018) (citation omitted). The court may not "make credibility determinations or reweigh the evidence," and should "defer to the plausible inferences the Board draws from the evidence, even if [the court] might reach a contrary result were [it] deciding the case de novo." *Alcoa Inc. v. NLRB*, 849 F.3d 250, 255 (5th Cir. 2017) (cleaned up).

"Because of the infinite and subtle gradations of authority within a company, courts normally extend particular deference to NLRB determinations that a position is supervisory." *Entergy II*, 810 F.3d at 292 (cleaned up). At the same time, we have repeatedly explained that the court's deference is not limitless. *See Carey Salt Co. v. NLRB*, 736 F.3d 405, 410 (5th Cir. 2013); *Creative Vision Res.*, 882 F.3d at 515 (observing that the court's review is not "*pro forma*" or "merely a 'rubber stamp'"). In reaching its conclusion on the supervisory status of an employee, the Board must engage in "reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*,

522 U.S. 359, 374 (1998) (citation omitted). The Board may not "ignore[] a portion of the record," *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 935 (5th Cir. 1993) (citation omitted), and the court must "consider the facts that militate or detract from the NLRB's decision as well as those that support it." *Alcoa, Inc.*, 849 F.3d at 255 (citation omitted).

We accord *Chevron* deference to the Board's interpretations of ambiguous provisions of the NLRA. *See NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 713 (2001). We will uphold the Board's interpretations "so long as [they are] rational and consistent with the Act." *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013) (citation omitted).

## IV.

### A.

The NLRA guarantees employees the right to unionize and to appoint a bargaining representative. *See* 29 U.S.C. § 157. The Act also requires employers to bargain with the representatives of their employees, 29 U.S.C. § 158(a)(5), but these protections do not extend to "any individual employed as a supervisor." 29 U.S.C. § 152(3); *Entergy II*, 810 F.3d at 291 ("To ensure that unions stay loyal to workers' interests, [the Act] excludes 'supervisors' from the class of 'employees' guaranteed the right to unionize and bargain.").

Because the Act distinguishes between employees and supervisors, "the statutory definition of supervisor [is] essential in determining which employees are covered by the Act." *NLRB v. Health Care & Retirement Corp. of Am.*, 511 U.S. 571, 573 (1994). Section 2(11) of the NLRA defines a supervisor as:

> [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to

recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). The Supreme Court has explained that this definition "sets forth a three-part test for determining supervisory status." *Ky. River*, 532 U.S. at 712–13. "Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment, and (3) their authority is held in the interest of the employer." *Id.* at 713 (internal quotation marks and citation omitted).[4] "Section 2(11) is to be read in the disjunctive, with the existence of any one of the statutory powers," or supervisory functions, "sufficient to confer supervisory status." *Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 479 (5th Cir. 2001) (quoting *NLRB v. KDFW-TV, Inc.*, 790 F.2d 1273, 1276 (5th Cir. 1986)).

Both the Board and this court have previously addressed the supervisory status of dispatchers employed by power utility companies.[5] The Board's conclusions have changed over time, informed by evolving guidance on the statutory definition of a supervisor. *See, e.g.*, *Big Rivers Elec. Corp.*, 266 NLRB 72 (1983) (holding that electrical dispatchers are supervisors because they work without the benefit of clear guidelines or manuals); *Miss. Power & Light Co.*, 328 NLRB 965, 971–73 (1999) (reversing prior decisions and holding that dispatchers are not supervisors because they follow "established protocol" and make assignments "within parameters carefully drawn"), *reversed by Entergy*

---

[4] The parties here agree that dispatchers exercise authority in the interest of Entergy.

[5] Though the history of electrical dispatcher cases provides an important backdrop for the Board's decision in this case, there is no categorical rule that all dispatchers must have the same supervisory status. *Compare NSTAR Elec. & Gas Co. & Utility Workers Union of America*, 360 NLRB No. 106 (2014) (holding that NSTAR's dispatchers are not supervisors), *with Entergy Miss., Inc.*, 367 NLRB No. 109 (2019) (holding that Entergy's dispatchers are supervisors); *see also Abilene Sheet Metal, Inc. v. NLRB*, 619 F.2d 332, 343 (5th Cir. 1980) (observing that supervisory status is a fact-intensive inquiry).

*Gulf States*, 253 F.3d at 211; *see also Ky. River*, 532 U.S. at 713 (criticizing the Board for an overly narrow interpretation of "independent judgment" and explaining that workers can exercise independent judgment even when their discretion involves "ordinary professional or technical judgment . . . in accordance with employer specified standards"). The Board's most recent opinion concluded that Entergy's dispatchers meet one of the statutory definitions of a supervisor: they "assign" employees to places using "independent judgment."

The Board recently clarified the definitions of these key statutory phrases in Section 2(11). In *Oakwood Healthcare, Inc.*, the Board "construe[d] the term 'assign' to refer to the act of designating an employee to a place (such as a location, department or wing), appointing an employee to a time (such as a shift or overtime period), or giving significant overall duties, i.e., tasks, to an employee." 348 NLRB at 689. The Board was explicit that a worker's ability to "affect *one* of these—place, time, or overall tasks—can be a supervisory function." *Id.* (emphasis added). Although a person exercises "assignment" power if he assigns an employee to "a certain department (e.g., housewares) or to a certain shift (e.g., night)," a worker does not make an "assignment" merely by "choosing the order in which the employee will perform discrete tasks within those assignments." *Id.* The Board explained that an employee exercises assignment powers by designating "significant overall duties to an employee," but he does not do so when he merely gives "ad hoc instruction." *Id.*

*Oakwood* also clarified the meaning of "independent judgment." The Board held that a worker exercises independent judgment when he "act[s] . . . free of the control of others and form[s] an opinion or evaluation by discerning and comparing data." *Id.* at 693. "[J]udgment is not independent if it is dictated or controlled by detailed instructions." *Id.* However, the "mere existence of company policies does not eliminate independent judgment from decision-

No. 19-60616

making if the policies allow for discretionary choices." *Id.* If an employer maintains a policy that guides an employee's actions while granting the employee discretion to "deviate from that policy based on the [employee's] assessment of the particular circumstances," the employee exercises independent judgment. *Id.* The Board also noted that the term "independent judgment" is "ambiguous as to the *degree* of discretion required for supervisory status," and therefore, the Board has the authority to define its meaning within reasonable limits. *Id.* at 714 (citing *Ky. River*, 532 U.S. at 713).

## B.

After we remanded this case in *Entergy II*, the Board held that dispatchers meet the statutory definition of "supervisor" because they assign field employees to places using independent judgment. The Board explained that the evidence identified by the *Entergy II* panel shows that dispatchers "prioritiz[e] outages, determin[e] how many employees should be sent to address a given outage, and decid[e] [whether] to reassign field employees or hold them over from their regular shift." Relying on *Oakwood*, the Board held that this evidence demonstrates that dispatchers make decisions "free from the control of others"—thus exercising independent judgment.

IBEW argues that this decision was not supported by substantial evidence and violated the Board's obligation to engage in reasoned decisionmaking.

## i.

IBEW first argues that the Board erred when it failed to provide a reasoned explanation for its conclusion that dispatchers "assign" employees to "places." As the Supreme Court has explained, the first prong of the Section 2(11) three-part test requires a supervisor to "hold the authority to engage in any 1 of the 12 listed supervisory functions." *Ky. River*, 532 U.S. at 713. In 2011, when the Board held that dispatchers are not supervisors, it assumed

without deciding that the "temporary assignment [of field employees] to a place of work constitutes assignment [under] Section 2(11)." In 2015, when we remanded the case, we also did not render a conclusive holding on the threshold question of whether dispatchers satisfy this element of the statutory definition. *See Entergy II*, 810 F.3d at 298 (holding that the evidence "arguably" meets the assignment standard). On remand, the Board did not provide a detailed analysis of this question, holding instead that dispatchers' actions "undisputedly" constitute assignment. The union argues that this conclusion was flawed because dispatchers are not authorized to make permanent assignments and they do not have the power to require a field employee to remain on the job past the conclusion of his shift.

We agree with IBEW that the Board failed to meaningfully engage with the scope of "assignment" powers under Section 2(11) or with *Oakwood*'s clarification of this statutory term. The Board's brief discussion of "assignment" was reduced to a simple conclusion: because dispatchers' decisions "necessarily result in . . . sending particular field employees to particular places," they "undisputedly assign employees to places." In reaching this conclusion, the Board did not address the allegedly temporary nature of dispatchers' assignments or the dispatchers' inability to require certain conduct.

Although the Board did not provide detailed analysis of dispatchers' assignment powers, its cursory treatment of this issue is excused by IBEW's own failure to adequately raise its argument before the Board. Under Section 10(e) of the NLRA, "[n]o objection that has not been urged before the Board, . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."[6] 29 U.S.C.

---

[6] IBEW does not argue that its failure is excused by "extraordinary circumstances."

§ 160(e). Section 10(e) stems from the "bedrock principle" that "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the *appropriate time*." *NLRB v. Saint-Gobain Abrasives, Inc.*, 426 F.3d 455, 458 (1st Cir. 2005) (alterations omitted) (emphasis added) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). Section 10(e) bars consideration of an issue that was "not raised during the proceedings before the Board." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982). In order to meet the requirements of Section 10(e), an objection must be specific enough to place the agency on notice of the party's objections. *See Marshall Field & Co. v. NLRB*, 318 U.S. 253, 255 (1943) (holding that a "general objection" does not sufficiently apprise the Board of the petitioner's arguments, and "may well account for the Board's failure to consider [the particular] question"); *Saint-Gobain*, 426 F.3d at 458.

IBEW contends that it has repeatedly asserted that dispatchers do not "assign" people to "places," but the union admitted during oral argument that it did not argue this point in its most recent brief to the Board. In the position paper IBEW filed on remand from the Fifth Circuit in 2015, IBEW did not argue that dispatchers do not "assign" field employees to "places," nor did it elaborate upon the points it makes here about the "temporary" nature of assignments or dispatchers' inability to require action. Though IBEW did not explicitly concede that dispatchers exercise assignment powers, it has not made a meaningful argument to the Board on this issue since 2007—eight years before we remanded this case to the Board in *Entergy II*.

IBEW's failure to raise these arguments at the appropriate time—in its brief to the Board on remand—precludes our court from considering dispatchers' assignment powers. *See Saint Gobain*, 426 F.3d at 458; *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 386 n.5 (1945). We have relied on Section

10(e) to bar appellate review of an issue not briefed to the Board, holding that the party's failure to adequately present its theory relieves the Board of an obligation to provide analysis on the issue. *See Creative Vision Res.*, 882 F.3d at 528; *Gulf States Mfg. Inc. v. NLRB*, 704 F.2d 1390, 1396–97 (5th Cir. 1983). The Supreme Court has also declined to excuse a party's failure to make a detailed objection to the Board where the aggrieved party "could have objected . . . in a petition for reconsideration or rehearing," but did not do so. *Woelke*, 456 U.S. at 666.[7]

IBEW argues that we should overlook Section 10(e)'s limitations because the Board does not rely upon this doctrine. Instead, Entergy, as Intervenor, asks the court to bar consideration of the union's assignment argument under Section 10(e), and the Board has not stated a position on this issue. In *Independent Electrical Contractors of Houston, Inc. v. NLRB*, we declined to apply Section 10(e) to bar review of an argument when the Intervenor, and not the Board, claimed waiver. 720 F.3d 543, 550 (5th Cir. 2013). We observed that Section 10(e) "is for the benefit of the Board, not a sword for intervenors," and explained that the requirement to raise an issue before the Board "can be measured in context." *Id.* at 551.

*Independent Electrical Contractors* may permit our court to excuse a party's failure to comply with Section 10(e), but we do not believe that the case *forbids* the application of 10(e) under these circumstances. IBEW has not shown that the Board was on notice of its assignment argument, which had last been raised nearly a decade before the remand in *Entergy II*. This stands in contrast to *Independent Electrical Contractors*, where we noted that the

---

[7] Though it does not cite a particular regulation, Entergy argues that IBEW could have filed a motion for reconsideration with the Board before appealing to this court. In its reply brief, IBEW does not object to this portion of Entergy's brief. *See also Gulf States Mfg.*, 704 F.2d at 1398 (citing regulations permitting an aggrieved party to file a motion for reconsideration in some circumstances).

Board had fully considered the issue in dispute, demonstrating that "the policies underlying the [10(e)] rule are not implicated." *Indep. Elec. Contractors*, 720 F.3d at 551 (citation omitted); *see also Davis Supermarkets, Inc. v. NLRB*, 2 F.3d 1162, 1175 (D.C. Cir. 1993) (noting that "briefing and argument before the Board are desirable," but "[t]he critical inquiry is whether the Board was given notice of the parties' objections to the Board's solutions" (cleaned up)). The Supreme Court has also stated that Section 10(e) can be considered by an appeals court *sua sponte*, undermining IBEW's argument that the doctrine's reach depends upon which party cites it. *See May Dep't Stores*, 326 U.S. at 386 n.5.

This conclusion is further supported by our cases discussing waiver principles in the context of a remand and subsequent appeal. "It is well settled in this Circuit that the scope of appellate review . . . is limited to matters presented to the [court below]." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339 (5th Cir. 2005). When reviewing a criminal appeal following a resentencing, we have affirmed the general principle that a party "may not revive in the second round an issue he allowed to die in the first." *United States v. Lee*, 358 F.3d 315, 324 (5th Cir. 2004) (quoting *United States v. Whren*, 111 F.3d 956, 960 (D.C. Cir. 1997)). Not only did IBEW fail to argue to the Board that dispatchers do not exercise assignment, it also failed to make this argument to our court in 2015. *See Lindquist v. City of Pasadena*, 669 F.3d 225, 239–40 (5th Cir. 2012) ("[A]n issue that could have been but was *not* raised on appeal is forfeited and may not be revisited by the district court on remand. The doctrine also prevents us from considering such an issue during a second appeal."). The fact that IBEW did not concede assignment powers does not alter this conclusion, because a litigant "must press and not merely intimate [an] argument" in order to preserve it for appeal. *FDIC v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994).

15

No. 19-60616

We therefore hold that IBEW waived its argument about dispatchers' assignment power, barring our review of the issue. *See Creative Vision Res.*, 882 F.3d at 528.[8]

ii.

IBEW also challenges the Board's conclusion that dispatchers exercise independent judgment when making assignments—the second prong of the *Kentucky River* three-part test. On remand, the Board found that the evidence we identified in *Entergy II* demonstrated that dispatchers exercise discretion when they prioritize outages, determine the number of employees to send to the site of an outage, and reassign employees in response to changing circumstances. Because these decisions require dispatchers to "make complex decisions" without clear "standard operating procedures or rules," the Board held that dispatchers exercise independent judgment.

IBEW challenges the Board's independent judgment conclusion on three grounds: (1) the Board's decision overlooked contrary evidence in the record; (2) the Board erred when it considered evidence of dispatchers' prioritization decisions; and (3) the Board erroneously overlooked the fact that dispatchers do not assess the skills of field employees.

a.

IBEW first argues that the Board arbitrarily ignored evidence that weighs against its "independent judgment" conclusion, including evidence that suggests that dispatchers make decisions in accordance with clear company guidelines. The Board may not "ignore[] a portion of the record" in reaching its

---

[8] We reject Entergy's alternative argument that the Board did not have to reach the issue of dispatchers' assignment power. Though the Board's conclusion was not detailed, it nonetheless meets the *Kentucky River* test, which requires a finding that an employee meets all three prongs of the Section 2(11) definition. *See Ky. River*, 532 U.S. at 713; *see also Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 378 (5th Cir. 2001) (holding that a conjunctive test requires a showing on all elements of the test).

decision, *McCullough Envtl. Servs., Inc.*, 5 F.3d at 935, and we have remanded cases where the Board fails to comply with its obligation to consider all relevant facts. *See, e.g.*, *Carey Salt*, 736 F.3d at 410. Indeed, we remanded this case to the Board in *Entergy II* precisely because we held that the Board had ignored a portion of the record in reaching its conclusion. *See Entergy II*, 810 F.3d at 297.

We have also explained, however, that the substantial evidence standard is "highly deferential." *U.S. Cellular Corp. v. City of Wichita Falls*, 364 F.3d 250, 256 (5th Cir. 2004) (citation omitted). Though we must consider facts that "militate or detract" from the Board's conclusion, *Alcoa*, 849 F.3d at 255, reversal is not required merely because the evidence could support two contrary conclusions. *See, e.g.*, *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012) ("We may not reweigh the evidence, try the case de novo, or substitute our judgment for that of the Board.").

The Board's decision on remand relies on the evidence we identified in 2015, which we explained "arguably shows" that dispatchers meet the NLRA's definition of supervisor. *Entergy II*, 810 F.3d at 298. Although the Board did not explicitly refer to the evidence that had previously led it to the opposite conclusion, it took "[o]fficial notice" of the factual record that was before the Board in previous iterations of this case. The Board also explained that "[t]he facts are fully discussed" in its previous decision, and its brief recitation of the facts on remand was intended "to reflect the evidence highlighted by the court for the Board to consider on remand."

These explanations adequately demonstrate that the Board considered the facts in the record before reaching its conclusion. The Board is not obligated to "balanc[e] the supervisory aspects of the job with the nonsupervisory in order to determine [a worker's] status." *Gurabo Lace Mills*, 249 NLRB 658, 658 (1980). When viewed in context, the Board's most recent decision demonstrates

that its decision was based on the complete record, including the evidence that previously led it to the opposite conclusion on dispatchers' supervisory status. Against this backdrop, the Board's conclusion must be sustained, even if the record might also support the opposite conclusion. *See Am. Textile*, 452 U.S. at 523 ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (citation omitted)).

b.

Second, IBEW argues that the Board erred when it considered dispatchers' role in prioritizing outages as part of its "independent judgment" analysis. Because "prioritization" is not one of the functions listed in the NLRA's definition of a supervisor, IBEW argues that it was error for the Board to consider this evidence. *See, e.g.*, *Ky. River*, 532 U.S. at 713 (explaining that Section 2(11) requires the supervisor to exercise independent judgment in connection with one of the supervisory functions).

Both the Board and federal courts frequently consider prioritization as an element of supervisory authority, even though "prioritization" is not one of the listed functions in Section 2(11). *See, e.g.*, *Del Valle v. Officemax N.A.*, 680 F. App'x 51, 62 (3d Cir. 2017) (upholding a determination that a worker is a supervisor because there was evidence that he "exercised discretion and independent judgment in . . . prioritizing tasks" (cleaned up)); *PPG Aerospace Indus., Inc.*, 353 NLRB 223, 223 (2008) (holding that workers "are supervisors because they have authority to prioritize and make changes to employees' work assignments"); *see also NLRB v. St. Clair Die Casting, LLC*, 423 F.3d 843, 849 (8th Cir. 2005) (affirming the Board's finding that workers were not supervisors where there "was evidence . . . that the setup specialists did not have independent authority to assign operators their initial tasks or to prioritize the work to be done on the shift").

Because the term "independent judgment" is ambiguous and the "Board is to be given room to apply the term," *Alois Box Co. v. NLRB*, 216 F.3d 69, 182 (D.C. Cir. 2000), the Board's analysis of dispatchers' prioritization decisions is entitled to deference. Here, the Board held that dispatchers' prioritization of outages required the use of independent judgment, and that this discretionary function *necessarily* results in the assignment of field employees to places. *See NLRB v. Security Guard Serv., Inc.*, 384 F.2d 143, 147 (5th Cir. 1967) (explaining that the statute requires a supervisor to "use independent judgment . . . in performing" specific supervisory functions). We have no trouble concluding that this interpretation was reasonable, well-reasoned, and supported by substantial evidence. The record evidence demonstrates that dispatchers do not rely upon a "manual" when deciding how to prioritize outage areas. Instead, there are numerous factors that dispatchers must juggle independently when determining where to send field employees—including the customers affected by each outage, the location of outages, the number of field employees needed to address the issue, the weather, and the associated safety risks. Though Entergy provides dispatchers with loose guidelines to aid these decisions, "the mere existence of company policies does not eliminate independent judgment from decision-making if the policies allow for discretionary choices." *Oakwood*, 348 NLRB at 693; *see also id.* (explaining that a manual that "details how a charge nurse should respond in an emergency" does not constrain independent judgment if it is left up to the nurse to determine "when an emergency exists or . . . [whether] to deviate from that policy"). And in making these independent and discretionary decisions, dispatchers necessarily decide which field employees to send to which outages. *See id.* at 689.

The Board's decision is also consistent with the First Circuit's contrary conclusion in *NLRB v. NSTAR Elec. Co.*, 798 F.3d 1 (1st Cir. 2015). In *NSTAR*,

the First Circuit affirmed the Board's conclusion that the company's electrical dispatchers do not exercise independent judgment when making assignments. *Id.* at 13–14. Unlike here, the court noted that the evidence demonstrated that the dispatchers were "controlled by detailed instructions" when prioritizing trouble cases, and that their decisions were the result of "established call-out procedures." *Id.* at 13–14 & n.13. In contrast, the evidence here indicates that dispatchers are "not dictated by any guidelines, policies and procedures [and are] supposed to use [their] judgment" when determining which outages to prioritize and, relatedly, where field employees should be sent. This evidence distinguishes this case from *NSTAR*, and is sufficient to establish that the dispatchers' prioritization decisions involved independent judgment and meet the statutory definition. *See Ky. River*, 532 U.S. at 713 ("It falls clearly within the Board's discretion to determine, within reason, what scope of discretion qualifies.").

c.

Finally, IBEW argues that the Board erred when it ignored evidence that dispatchers do not assess the skills of field employees. IBEW concedes that skills assessment is not necessary for a finding of independent judgment, but it argues that this evidence was relevant and should have been considered by the Board in its independent judgment analysis.

Whether a purported supervisor uses independent judgment in assessing the skills of those under his direction is, to be sure, an indicator of supervisory status. *See Oakwood*, 348 NLRB at 689 (holding that "matching a patient's needs to the skills and special training of a particular nurse is among those factors critical to the employer's ability to successfully deliver health care services"). Courts have noted the significance of such decisions when ruling both for and against supervisory status. *Compare Cooper/T. Smith, Inc. v. NLRB*, 177 F.3d 1259, 1265 (11th Cir. 1999) ("judgment about the individual

employee's skills" can establish assignment of employees using independent judgment), *and Am. Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 896 (7th Cir. 1981) (same), *with Thyme Holdings, LLC v. NLRB*, No. 17-1191, 2018 WL 3040701, at *3 (D.C. Cir., May 22, 2018) (assignments of nurses engaged in routine, clerical work was "simply to equalize workloads and ensure timely completion of tasks").  But here, though there is no evidence in the record that Entergy's dispatchers consider field employees' skills or qualifications, the evidence demonstrates that dispatchers' work is far from mechanical, requiring them to juggle a number of complex factors when making assignments. This work requires dispatchers to engage in flexible, individualized assessments of each outage, rather than applying a predetermined schedule in a rote manner. Skills assessment was unnecessary to explore in light of this evidence.

The Board's decision identified many ways in which dispatchers exercise independent judgment even without engaging in skills assessment. Our inquiry on appeal is restricted to a narrow question: whether the Board's decision is supported by substantial evidence. This is a "limited" standard of review, *see Central Freight Lines, Inc. v. NLRB*, 624 F.2d 1301, 1302 (5th Cir. 1980), and we may not reverse even if we might reach a different decision in the first instance. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (holding that court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*"). Because there is substantial evidence to support the conclusion that dispatchers engage in independent judgment in making assignments, the Board did not err when it failed to address the fact that dispatchers do not assess the skills of field employees.

No. 19-60616

V.

For the foregoing reasons, we AFFIRM the judgment of the NLRB and DENY IBEW's petition for review.